**Fred P. Auxer, Appellant, v. Edward Llewellyn, Appellee.**

**Gen. No. 5,036.**

1. MAXIMS—*extent of application in Illinois of rule of in pari delicto.* The rule is not of universal application in this state that where parties voluntarily engage in an unlawful or illegal transaction, the law will hold them to be *in pari delicto*, and that there cannot be a recovery by one of the parties from the other, even when there is no statute providing for a recovery.

2. GAMBLING—*when recovery of money lost, may be had. Held,* that notwithstanding the plaintiff sought to perpetrate a fraud, he was entitled to recover, in the interests of public policy, money lost or sought to be wagered upon a "fake" fight. The right of recovery in this state is recognized whether the bet is on a "sure thing" or upon an uncertain event.

Attachment. Appeal from the Circuit Court of Livingston county; the Hon. GEORGE W. PATTON, Judge, presiding. Heard in this court at the April term, 1908. Reversed and remanded. Opinion filed August 10, 1908.

Statement by the Court. The record shows that the plaintiff, Fred P. Auxer, and defendant, Edward Llewellyn, both reside in Cleveland, Ohio. Auxer first met Llewellyn in September, 1904. One Carrol, apparently a mutual friend of plaintiff and defendant, in September of that year met Auxer, and told him he knew of a good thing; if a man had $1,500 which could be used for a little while, a man could make $300 with no risks. He also told Auxer that one Taber had told him that it was proposed to pull off a fake prize fight in Illinois, and that a friend of his, Edward Llewellyn, whom he had known as a boy, was to be one of the fighters; that Llewellyn was from Cleveland, and they wanted a man from Cleveland with $1,500 or $2,000 to come out with Llewellyn as a backer; that this money was not to be used, but only to be deposited to show that Llewellyn had some finacial backing. Auxer then saw Llewellyn, and expressed a doubt whether he could raise that much cash at that time. A friend of Auxer gave him a letter of credit for $1,500; this Auxer showed to Llewellyn, who said he did not know whether that would do or not, but Llewellyn said they would take it to Fairbury, Illinois, to a man named Haughn, who would be able to tell whether it would do. Llewellyn told Auxer that Haughn was connected with the Bloomington Athletic Club, and was the man who was to frame up this fight. Llewellyn showed Auxer some letters, between himself and Haughn, written on stationery of the Bloomington Athletic Club stating that in Bloomington they had a fighter named Bennett whom the sports had won considerable money on and they were willing to back him to a considerable extent against Llewellyn, and that Haughn was to manage the deal. It was proposed that Bennett was to be beaten by Llewellyn, and Haughn said in the letters that these sports had been cleaning up a lot of money, while he had been working in his official capacity for the club, and that he now proposed to make a little money himself so he had framed up this fight.

Auxer, Taber and Llewellyn left Cleveland and came to Fairbury, where they met Haughn in a room in the Thomas House. Auxer showed his letter of credit to Haughn, who told him that it would not do, that they must have cash to deposit in the bank, and that he ought to have $2,000, so that if his standing was questioned the money could be produced. Auxer went back to Cleveland and procured a certified check for $1,500 and $500 cash, and then returned to Fairbury, arriving there Sunday evening, and deposited the $2,000 in the First National Bank of Fairbury on Monday morning. That evening the Bloomington sports, Funk and Livingston, arrived with Bennett. It had been arranged between Haughn, Llewellyn and Auxer that a match should first be made for about $2,500 a side, and that they would make some side bets later. The plan was that Llewellyn and Auxer should leave the hotel, apparently to get the money to bet with, and upon their return to the hotel Haughn was to meet them in the hallway and hand Auxer the money to wager on the fight; Auxer would then bet the money handed to him by Haughn with the Bloomington parties, Auxer at no time putting up any of his money; Haughn seemingly acting as the stakeholder would apparently place the money in the satchel and put it in the safe in the hotel. The next two days the same performance was repeated, except that these bets were $1,500. The fake fight was to take place on Friday. On Friday morning Haughn suggested that the Bloomington people had some more money, and that they make another bet of $2,500 a side. The agreement for this bet was made in the hotel, and Auxer and Llewellyn started as usual down the street, making a show of going after the money. When they were on the street, Auxer noticed that the Bloomington men were following them and called Llewellyn's attention to it; Llewellyn said "You will have to make good now. Those fellows are right behind us. It won't make any difference; you draw the money and Haughn will hand it back to you." They

went into the bank, followed by the Bloomington people, and Auxer drew the $2,000. They then returned to the Thomas House, where Auxer handed the $2,000 to Haughn, thus apparently betting his own money. He realized immediately that he had been fleeced, and went to his room with Llewellyn and Taber, where he accused them of being in the steal. They assured him it was all right. Haughn sent Bennett up to Auxer's room, to tell them "They were ready to pull off the fight." Auxer went down stairs, but would not go to the place where the fake fight was to be held. All went out on the street, and Auxer hunted up the mayor and had Llewellyn, Taber, Haughn and the Bloomington parties arrested. Llewellyn apparently had no money while he was on the way from Cleveland to Fairbury. Auxer understood he was to get $300 from Haughn or Llewellyn or some other person out of the money they expected to win from the Bloomington people, and that the Bloomington fighter was to let Llewellyn beat him and Llewellyn was to be declared the winner. Auxer, apparently betting with the Bloomington parties, placed his money with Haughn and not with Llewellyn. Llewellyn when arrested on the day that the fight was to have occurred had no money. All that he had was a satchel with a pair of old boxing gloves. He and Taber were arrested a second time, when they were about to go away on a train a day or two later; and then Llewellyn had $60 in his pocket and $800 concealed in his hat. This money was placed in the First National Bank, and is the property attached in this suit.

Fred P. Auxer began this suit in attachment against Edward Llewellyn in the Circuit Court of Livingston county on September 24, 1904. The affidavit for the attachment states that Llewellyn is indebted to Auxer $870, and that the defendant obtained the same by conspiring with other persons, and that the defendant is about to depart from this State with the intention of having his effects removed therefrom, and other statutory reasons. The declaration contains the common

counts. The only plea is the general issue. At the close of plaintiff's evidence the court directed a verdict for the defendant. A motion for a new trial was overruled, judgment entered on the verdict and plaintiff appeals.

WHITE & TUESBURG, for appellant.

A. C. NORTON, for appellee.

MR. PRESIDING JUSTICE THOMPSON delivered the opinion of the court.

The only question presented for review is the propriety of the instruction to the jury to find for the defendant. Appellant by his own showing was ambitious to become a member of a class of confidence sharks. He willingly joined with Llewellyn, Taber and Haughn in an arrangement with Bennett that Bennett and Llewellyn should have a fake fight, in which appellee was to win, and the Bloomington sports, who had bet their money on Bennett, were to lose and Auxer who had nominally bet his money on Llewellyn on a sure thing was to win, and was to receive $300 "easy money" for permitting his name to be used as a financial backer of Llewellyn, although he believed he was not risking anything. The proof tends to show that the real conspiracy was between Llewellyn, Bennett, Haughn, Taber, Funk and Livingston "to make a killing," and that Auxer was the lamb they had selected for the sacrifice. Before the time for the fight arrived, appellant realized how he had been trapped and had repented and demanded his money back.

Appellant in making out his case shows that he believed that he and appellee, with Haughn, Taber and Bennett, were engaged in an unlawful enterprise against Funk and Livingston. It is claimed they were *in pari delicto,* and the Circuit Court held that the maxim *potior est conditio defendentis* applies. Appellee cites Shaffner v. Pinchback, 133 Ill. 410; Mosher v. Griffin, 51 Ill. 184, and the dissenting opinions in

Pearce v. Foote, 113 Ill. 244, and Stewart v. Wright, 147 Fed. R. 336, in support of his contention that because of this maxim the court should leave the parties as it finds them.

The rule is not of universal application in this State that where parties voluntarily engage in an unlawful or illegal transaction, the law will hold them to be in pari delicto, and that there cannot be a recovery by one of the parties from the other, even when there is no statute providing for a recovery. Evans v. Funk, 151 Ill. 650; Herrick v. Lynch, 150 Ill. 283; Paige v. Hierony-mus, 180 Ill. 637.

At the common law, gambling contracts when fair and free from cheating, were assumed by the court to be valid. There were however certain classes of wagering contracts which were exceptions to the general rule. 14 Am. & Eng. Ency. of Law, 2nd Ed., 586. By the Statute of Illinois all gambling is prohibited and all gambling contracts are made invalid, except contracts of insurance (sections 126 to 137 of the Criminal Code). Section 132 of the Criminal Code provides: Any *person who shall* at any time or sitting, by playing at cards, dice or any other game or games, or by betting on the side or hands of such as do game, or *by any wager or bet* upon any race, *fight,* pastime, sport, lot, chance, casualty, election of unknown or contingent event whatever, *lose to any person* so playing or *betting any sum of money,* or other valuable thing amounting in the whole to the sum of $10, and shall pay or deliver the same, or any part thereof, the *person so losing and paying or delivering the same shall be at liberty to sue for and recover the money, goods or other valuable thing, so lost and paid* or delivered or any part thereof, or the full value of the same, by action of debt, replevin, assumpsit or trover or proceeding in chancery, from the winner thereof with costs in any court of competent jurisdiction. In any such action at law it shall be sufficient for the plaintiff to declare generally as in actions of debt or assumpsit for money had and received by the defend-

ant to the plaintiff's use,'' etc. By sections 231 to 235 of the Criminal Code, prize fighting, sparring and boxing are made illegal and criminal, and all parties who participate in or encourage or promote such contests are liable to fine or imprisonment. Section 132 provides that parties wagering their money on a fight may after they have parted with it sue and recover the same. A fight is illegal even if the parties thereto honestly endeavor to overcome each other. If there are no degrees in crime, then it was not more wrongful because the fight was a cheat and fixed.

It is said appellant did not lose his money to appellee, but to Haughn. ''There is and can be no such thing as agency in the perpetration of crimes or misdemeanors, or indeed in the doing of any unlawful act. All parties actively participating are principals.'' Pearce v. Foote, 113 Ill. 228. The maxim applies ''Who acts through another is in law considered as doing it himself.'' If Haughn received the money of appellant on a bet and divided the proceeds with appellee then appellee must be held to be a winner of the money of appellant. In view of the statute the maxim *potior est conditio defendentis* cannot be invoked to bar this suit. Recoveries have been sustained on transactions very similar to the case at bar, in the following cases: Snyder v. Nelson, 101 Ill. App. 619; Falkenberg v. Allen, 90 Pacific R. 415 (Okla.), 10 L. R. A. 494 (N. S.); Hobbs v. Boatright, 195 Mo. 693; Lockman v. Cobb, 77 Ark. 279; Stewart v. Wright, 147 Fed. R. 321. We are of the opinion that while the appellant was willing to be a confidence shark, still the statute of this state, in the interest of public policy, has not excepted bets on fake races or fights from the general rule, and permits the victim of such a conspiracy, although a conspirator, to recover his money, whether the bet was on a sure thing or on an uncertain event.

It is said there was no proof that the money found upon appellee was any portion of the money deposited with Haughn by appellant. The proof is that appellee

272    APPELLATE COURTS OF ILLINOIS.

The Com. of Vermilion Special Drain. Dist. v. Shockey, 142 App. 272.

on his way from Cleveland to Fairbury had no money; that he borrowed small sums on the train from appellant and that he said he was "dead broke." The money found on him was concealed in his hat. These were facts from which it might be inferred the money found on him was the money of appellant, and that Auxer was staking his money against the combined cunning of the reputed pugilists and their associates. There was evidence that should be submitted to a jury on the question whether appellee had the money or any part of it that was wagered by appellant on the fake fight. The instruction to find the appellee not guilty should not have been given. For this error the judgment is reversed and the cause remanded.

                                        *Reversed and remanded.*